**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

LOUIS J. SCORPINITI,

               Plaintiff,

vs.

FOX TELEVISION STUDIOS, INC.,

               Defendant.

No. 11-CV-64-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    **PROCEDURAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

III.   **SUBJECT MATTER JURISDICTION** . . . . . . . . . . . . . . . . . . . **3**

IV.   **SUMMARY JUDGMENT STANDARD** . . . . . . . . . . . . . . . . . . **3**

V.    **RELEVANT FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . **4**
      A.    *Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
      B.    *Scorpiniti's THE GATE Mark* . . . . . . . . . . . . . . . . . . . **4**
      C.    *FTVS's THE GATES Mark* . . . . . . . . . . . . . . . . . . . . . **6**
      D.    *Alleged Infringement* . . . . . . . . . . . . . . . . . . . . . . . . . **7**

VI.   **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
      A.    *Infringement Claim* . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
           1.    *Protectible interest* . . . . . . . . . . . . . . . . . . . . . . **9**
               a.    *Use in commerce* . . . . . . . . . . . . . . . . . . . . . **11**
               b.    *Use in connection with television broadcasting*
                    *services* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**
               c.    *Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**
           2.    *Likelihood of confusion* . . . . . . . . . . . . . . . . . . . **18**
                a.    *Strength of Scorpiniti's mark* . . . . . . . . . . . **19**
                    I.    *Conceptual strength* . . . . . . . . . . . . . . . **20**
                    ii.   *Commercial strength* . . . . . . . . . . . . . . **23**
                    iii.  *Summary* . . . . . . . . . . . . . . . . . . . . . . **25**
                b.    *Similarity* . . . . . . . . . . . . . . . . . . . . . . . . . . **26**
               c.    *Competitive proximity* . . . . . . . . . . . . . . . . **28**

|  | *d.* | *Intent* | 29 |
|  | *e.* | *Degree of care* | 31 |
|  | *f.* | *Actual confusion* | 32 |
|  | *g.* | *Summary* | 34 |
|  | *3.* | *First Amendment* | 35 |
|  | *4.* | *Damages* | 35 |
| *B.* | *Remaining Claims* | | 35 |
| *VII.* | *CONCLUSION* | | 36 |

## I. INTRODUCTION

The matter before the court is Defendant Fox Television Studios, Inc.'s ("FTVS") "Motion for Summary Judgment" ("Motion") (docket no. 55).

## II. PROCEDURAL HISTORY

On December 21, 2011, Plaintiff Louis J. Scorpiniti filed an Amended Complaint ("Complaint") (docket no. 15) against FTVS. Count I alleges trademark infringement in violation of 15 U.S.C. § 1114.[1] Count II alleges false designation of origin and unfair competition in violation of 15 U.S.C. § 1125. Count III alleges unfair competition under Iowa law.

On September 26, 2012, FTVS filed an Answer (docket no. 47), denying Scorpiniti's allegations, asserting affirmative defenses and counterclaims against Scorpiniti. Counterclaim I requests that the court cancel Scorpiniti's trademark for nonuse. Counterclaim II requests that the court cancel Scorpiniti's trademark due to fraud on the United States Patent and Trademark Office ("USPTO").

On November 14, 2012, FTVS filed the Motion. On December 12, 2012, Scorpiniti filed a Resistance (docket no. 66). On December 21, 2012, FTVS filed a Reply (docket no. 69). In the Motion, FTVS requests the opportunity to present oral argument. The court finds that a hearing is unnecessary. The matter is fully submitted and ready for

---

[1] Scorpiniti mistakenly cites to 15 U.S.C. § 1117 in the Complaint.

decision.

### III. SUBJECT MATTER JURISDICTION

The court has federal question subject matter jurisdiction over Scorpiniti's first two claims because they arise under the Lanham Act, 15 U.S.C. §§ 1114 and 1125.  *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  The court has supplemental jurisdiction over Scorpiniti's third claim because "the federal-law claims and state-law claim[] in the case derive from a common nucleus of operative fact and are such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." *Kan. Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*, 77 F.3d 1063, 1067 (8th Cir. 1996) (second alteration in original) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988)) (internal quotation marks omitted); *see also* 28 U.S.C. § 1367 ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").

### IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)), *cert. denied*, 132 S. Ct. 1144 (2012).  "[S]elf-serving allegations and denials are insufficient to create a genuine issue of material fact." *Anuforo v. Comm'r*, 614 F.3d 799, 807 (8th Cir. 2010).  "To survive a motion for summary judgment, the nonmoving party must

substantiate [its] allegations with sufficient probative evidence [that] would permit a finding in [its] favor based on more than mere speculation, conjecture, or fantasy." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (second alteration in original) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003)) (internal quotation marks omitted).  The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences.  *See Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 819 (8th Cir. 2011).

## V.  RELEVANT FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to Scorpiniti and affording him all reasonable inferences, the uncontested material facts are as follows.

### A.  Parties

Scorpiniti is a citizen of Iowa who resides in Des Moines, Iowa.  Scorpiniti produces and broadcasts religious-based television programs.

FTVS is a Delaware corporation with its principal place of business in Los Angeles, California.  FTVS is a television production company that creates and produces television shows.

### B.  Scorpiniti's THE GATE Mark

On November 25, 2008, the USPTO registered "THE GATE," U.S. Reg. 3,536,556, to Scorpiniti as a service mark in International Class 38 for use in relation to "television broadcasting."  Plaintiff's Exhibit 1 (docket no. 15-1) at 1.  In his trademark registration application, Scorpiniti included the disclaimer, "[n]o claim is made to the exclusive right to use the, gate apart from the mark as shown."  Defendant's Appendix ("Def. App'x") (docket nos. 55-3 through 55-4) at 48.

Scorpiniti first used THE GATE in 2007 in association with the program *Soul Search*, which is broadcast on the central Iowa Mediacom public access cable system. During his deposition, Scorpiniti testified that, while he had no documentation about the

4

broadcast distribution of the central Iowa Mediacom public access cable system, he had heard that the "footprint is central Iowa to on occasion the footprint is considerably larger." Def. App'x at 3.   Scorpiniti's friend, Craig Hutchinson, produces and stars in *Soul Search*.   *Soul Search* is a religious music television program in which Hutchinson plays music videos and, in between videos, reads scripture and provides humor.

In 2007, Scorpiniti was developing his own religion-themed music television show, *The Gate*.  When Scorpiniti received music videos that he felt were not appropriate for *The Gate*, he provided those videos to Hutchinson free of charge for use in *Soul Search*.  At the beginning and end of each episode of *Soul Search*, a character generation appeared on screen stating that *Soul Search* was "in association with," among other things, "THE GATE."    Defendant's Statement of Undisputed Facts (docket no. 55-2) ¶ 14. Occasionally, THE GATE was also used in a voiceover during *Soul Search*.  Other than providing free music videos to Hutchinson and being a "cheerleader," Def. App'x at 5, Scorpiniti did not assist Hutchinson with *Soul Search*.  Specifically, Scorpiniti did not distribute *Soul Search* or provide videography, audio or other production support for *Soul Search*.  Scorpiniti did not charge Hutchinson for the videos he provided to *Soul Search* or for Hutchinson's use of THE GATE, and he did not make any profit from *Soul Search*. Def. App'x at 6.

Scorpiniti's only other use of THE GATE was in connection with his music television program, *The Gate*.    Scorpiniti developed a website at the domain www.thegatetv.com and completed two episodes of *The Gate*—a pilot and episode one. Scorpiniti posted the pilot on YouTube on August 26, 2009.  As of April 18, 2011, the pilot had been viewed 4,197 times.  Scorpiniti posted episode one of *The Gate* on his Facebook page, which was accessible to his Facebook friends, on January 26, 2011. Scorpiniti never broadcast *The Gate* on television.  Scorpiniti sent the pilot of *The Gate* to several television networks for informational and research purposes but never made an

agreement with any network to distribute *The Gate*.

Scorpiniti testified that the font color in one specimen of THE GATE was purple. Def. App'x at 30. Scorpiniti further testified that his THE GATE mark is not red, and he testified that red references blood, which is not what his mark references. *Id.* In the pilot episode, THE GATE is accompanied by the phrase "positive impact music." Defendant's Statement of Undisputed Facts ¶ 47.

### C. FTVS's THE GATES Mark

On January 21, 2010, FTVS filed Trademark Application Serial Number 77,917,383 for the mark "THE GATES" in relation to "[e]ntertainment services in the nature of a television series featuring drama." Plaintiff's Exhibit 2 (docket no. 15-2) at 2. The USPTO initially rejected FTVS's THE GATES mark due to a perceived likelihood of confusion between FTVS's mark and two prior existing marks, including Scorpiniti's THE GATE mark. FTVS responded to the USPTO, arguing that there was no likelihood of confusion with Scorpiniti's mark due to differences in the parties' services. Specifically, FTVS argued that its mark referenced a television series featuring a specific gated community inhabited by supernatural beings, while Scorpiniti's mark had religious significance. The USPTO then withdrew its rejection of FTVS's mark with respect to likelihood of confusion with Scorpiniti's mark, concluding that there was no likelihood of confusion between Scorpiniti's THE GATE mark and FTVS's THE GATES mark. On January 11, 2011, the USPTO issued a Notice of Publication of FTVS's THE GATES mark. Scorpiniti initially filed a Petition for Opposition to FTVS's mark, but he withdrew his opposition on June 15, 2011. According to Scorpiniti, he withdrew his opposition after FTVS was unwilling to settle with him and he chose instead to file the instant action. Plaintiff's Appendix ("Pl. App'x") (docket no. 66-1) at 4.

FTVS's television show, *The Gates*, aired on ABC from June 20, 2010, through September 19, 2010. *The Gates* is a fictional one-hour-long crime drama set in Los

Angeles, California.  The show features a former Chicago police officer who has moved with his family into a gated community called "The Gates," which is filled with supernatural entities such as witches, werewolves and vampires.  In addition to airing *The Gates* on national television, ABC promoted *The Gates* through advertisements on national television and in national publications.  *The Gates* was canceled after one season.  The production cost for one episode of *The Gates* was $2,247,467.

The font for FTVS's THE GATES mark is red.  Scorpiniti testified that, in a search for "abc the gate" on Google, all the documents obtained identified ABC as the source of the program.  Def. App'x at 32.

### D. Alleged Infringement

At the time Scorpiniti was developing *The Gate*, ABC began airing *The Gates*, along with a large marketing campaign promoting the show.  Scorpiniti testified that, around the summer of 2010 when *The Gates* began airing on ABC, there was a substantial increase in the number of views of his *The Gate* pilot on YouTube.  Additionally, Scorpiniti testified that his girlfriend at the time, Vicki Delaria, saw an advertisement for *The Gates* and told Scorpiniti, "[t]here you are."  Def. App'x at 26.  Scorpiniti also testified that "some guy" in a restaurant came up to him and said "you're the producer of *The Gates*." *Id.*

Scorpiniti was collaborating with Dane Shearer to create his *The Gate* television show.  Shearer was an investor in *The Gate*, but he dropped out of the project after *The Gates* aired on ABC.  Shearer testified in his deposition that he was involved in an unrelated legal dispute with one of the franchise owners of his radon testing company and "had no desire to go up against either ABC, Fox, or Disney."  Def. App'x at 68.  In response to the question, "Any other reason for abandoning the project," Shearer testified

"No."[2]  *Id.*  Scorpiniti testified that he is no longer producing his *The Gate* television program because "[t]hat name has been ruined by Fox. It's of no commercial value. I could never use it again. It means death. It means werewolves, witches, vampires." Def. App'x at 11.

Scorpiniti never advertised his *The Gate* program on radio or television, in newspapers or on the internet. Furthermore, there is no evidence that either Shearer or Scorpiniti conducted any surveys to see if consumers associated the THE GATE mark with Scorpiniti, his *The Gate* program or *Soul Search*. In his deposition, Shearer confirmed that the term "The Gate" would have virtually no name recognition in the general public. Def. App'x at 68. Shearer and Debra Shearer, who was also involved in the development of *The Gate*, testified that their music program *The Gate* and FTVS's television show *The Gates* had substantially different content, describing the programs as "[a]lmost the opposite," Def. App'x at 64, and "opposite," *id.* at 72. Scorpiniti testified that he thought the content of the shows was so different that he did not think that they could "coexist." *Id.* at 20. Additionally, the term "the gate" or "the gates" has appeared in a number of third-party television shows, films, books and other artistic works. *See* Def. App'x at 87-89.

---

[2] In a subsequent affidavit, Shearer avers that he withdrew his financing for *The Gate* because ABC aired FTVS's *The Gates* program. Pl. App'x at 11. Shearer further avers that consumer association of the term The Gate with FTVS's *The Gates* program and the content of FTVS's show destroyed any chance of using Scorpiniti's mark THE GATE in relation to positive impact music. *Id.* at 11-12. However, self-serving affidavits that conflict with prior deposition testimony cannot create an issue of material fact. *See RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (holding that subsequent affidavits that contradicted earlier statements did not create a genuine issue of material fact and stating that "parties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment"). Thus, the court shall only credit Shearer's deposition testimony regarding his reasons for withdrawing funding from *The Gate*.

Scorpiniti developed income statements to forecast the profits he would earn from *The Gate* based on conservative estimates of revenue generated with expanding broadcast platforms. Scorpiniti estimated that his *The Gate* program would generate approximately $1.4 million in profits over the first fifteen months of operation. Pl. App'x at 3. Scorpiniti's income statements relied on assumptions of future costs and revenue. Scorpiniti had never produced a television program on his own that generated the level of income that he projected for *The Gate*. Additionally, Scorpiniti never rented space or purchased equipment for the production of *The Gate*. Scorpiniti avers that he invested $121,000 to develop the pilot and thirteen episodes of *The Gate*, although he does not provide any supporting documentation. *Id.*

## VI. ANALYSIS

### A. Infringement Claim

Scorpiniti's infringement claim requires proof of two elements. First, Scorpiniti must establish that he has a valid, protectible mark. *B& B Hardware, Inc. v. Hargis Indus., Inc.*, 569 F.3d 383, 389 (8th Cir. 2009). Second, if Scorpiniti has a protectible interest, he must prove that FTVS has infringed upon that right. *Id.* Infringement is judged by asking whether there is a likelihood of confusion among consumers. *Id.* The court will first address whether Scorpiniti has a protectible interest. The court will then assess whether there is a likelihood of confusion. After considering the merits of Scorpiniti's trademark claim, the court will address FTVS's first amendment and damages arguments.

### 1.    Protectible interest

FTVS argues that Scorpiniti's THE GATE mark is not protectible because he was not using THE GATE in commerce in connection with television broadcasting services at the time he submitted his trademark registration application. FTVS further argues that the court should cancel Scorpiniti's registration because the mark was invalid at the time it was

registered.   In response, Scorpiniti argues that he was using the mark in commerce in connection with television broadcasting services because THE GATE was used on the program *Soul Search* at the time Scorpiniti applied to register his service mark.

"The term 'service mark' means any word, name, symbol, or device, or any combination thereof . . . used by a person." 15 U.S.C. § 1127.[3]  "The definition of 'service mark' is virtually identical to the definition of 'trademark.'  But while service marks apply to intangible services, trademarks are used to distinguish tangible goods." *Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1356 (Fed. Cir. 2009).  "'It is clear from the wording of the Lanham Act that applications for service mark registrations are subject to the same statutory criteria as are trademarks." *Id.* at 1357 (quoting 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 19:82 (4th ed. 2008)). A registered mark enjoys the presumption of validity, but that presumption may be rebutted. *See WSM, Inc. v. Hilton*, 724 F.2d 1320, 1326 (8th Cir. 1984).

In an application for registration of a service mark, the owner of the service mark must file a verified statement that the owner is using the mark in commerce in connection with the services identified in the application.  *See* 15 U.S.C. § 1051(a)(3); *see also Aycock Eng'g, Inc.*, 560 F.3d at 1357 ("One . . . statutory criterion that applies to . . . service marks is the 'use in commerce' requirement."); *see also Flavor Corp. of Am. v. Kemin Indus., Inc.*, 493 F.2d 275, 284 (8th Cir. 1974) ("[T]rademark rights are acquired only by actual use of a mark in commerce in connection with the goods.").  The court will

---

[3] The definition of service mark also includes "any word, name, symbol, or device, or any combination thereof . . . which a person has a bona fide intention to use in commerce and applies to register on the principal register." 15 U.S.C. § 1127.  This portion of the definition does not apply to Scorpiniti, because in his application he represented to the USPTO that he was using his mark in commerce, not that he had a future intention to use the mark.  *See* 15 U.S.C. § 1051 (differentiating between an "Application for use of trademark" and "Application for bona fide intention to use trademark").

first determine whether Scorpiniti used THE GATE in commerce.  The court will then determine whether Scorpiniti used THE GATE in connection with television broadcasting services.

### a.    Use in commerce

FTVS argues that Scorpiniti did not use THE GATE in commerce and, therefore, the court should grant summary judgment on Count I and Counterclaim I.  Specifically, FTVS argues that, at the time Scorpiniti applied for his service mark, he had not used THE GATE in the ordinary course of trade because Scorpiniti provided music videos free of charge to a public access television program that did not air outside of the State of Iowa. In response, Scorpiniti argues that he obtained the music videos from outside of Iowa and that the footprint of the central Iowa Mediacom cable channel was occasionally much larger than central Iowa.

"The term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark."  15 U.S.C. § 1127. "The word 'commerce' means all commerce which may lawfully be regulated by Congress."  *Id.*

> For service marks, the "use in commerce" requirement is met when (1) a mark is "used or displayed in the sale or advertising of services" and (2) either (I) the services are "rendered in commerce" or (ii) the services are "rendered in more than one State or in the United States and a foreign country and the person rendering those services is engaged in commerce in connection with the services."

*Aycock Eng'g, Inc.*, 560 F.3d at 1357 (quoting 15 U.S.C. § 1127); *see also Gay Toys, Inc. v. McDonald's Corp.*, 585 F.2d 1067, 1068-69 (C.C.P.A. 1978) (holding that a trademark application was void because the applicant's goods were not in existence at the time the application was filed and, therefore, the applicant had not used the mark in commerce in association with the goods); 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair

Competition § 19:103 (4th ed. 2012) ("To qualify for registration, the Lanham Act requires that the mark be both used in the sale or advertising of services and that the services themselves have been rendered in interstate or foreign commerce." (emphasis omitted)).  "The language of the statute . . . makes plain that advertisement and actual use of the mark in commerce are required; mere preparations to use that mark sometime in the future will not do." *Aycock Eng'g, Inc.*, 560 F.3d at 1360; *see also Flavor Corp. of Am.*, 493 F.2d at 284 (finding that advertising and mailing price lists are not sufficient to acquire trademark rights).  "The registration of a mark that does not meet the use requirement is void ab initio." *Aycock Eng'g, Inc.*, 560 F.3d at 1357.

First, the court finds that Scorpiniti did not use his mark in connection with services rendered in commerce.  Scorpiniti provided music videos to Hutchinson free of charge.  Additionally, Scorpiniti testified that he never received any payment in connection with his involvement in *Soul Search*.  Def. App'x at 6.  Moreover, *Soul Search* aired on a public access television station, and there is no evidence that the public access television station carried commercial programming.  Therefore, the court finds that, at the time Scorpiniti applied to register THE GATE, he had not made a bona fide use of the mark in the ordinary course of trade.  *See Burlington N. Santa Fe Corp. v. Purdy*, 204 F.3d 1114 (Table), No. 98-11485, 1999 WL 1328011, at *1 (5th Cir. Dec. 7, 1999) (canceling a mark for failure to render the services identified by the mark in interstate commerce because, while the mark holder was using the mark to promote his gratuitous advocacy efforts, those activities did "not demonstrate use of the service mark in furtherance of a business intended to provide services for reimbursement" and evidence of "sporadic and insubstantial transactions" was not sufficient to establish rendition of services in interstate commerce because "[n]ominal or token sales to personal friends do not constitute a *bona fide* commercial use of a trademark"); *Purdy v. Burlington N. Santa Fe Corp.*, 21 F. App'x 518, 520 (8th Cir. 2001) (affirming the district court's determination that "the

12

railway had made the first bona fide use of the mark" because the plaintiff's "use of the mark in interstate and intrastate commerce was sporadic, de minimis, and not directed at a relevant purchasing public"); *see also Buti v. Perosa, S.R.L.*, 139 F.3d 98, 103 (2d Cir. 1998) (noting that trademark rights exist "only 'as a right appurtenant to an established business or trade in connection with which the mark is employed.'" (quoting *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 (1918)) (emphasis omitted)); *La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1272 (2d Cir. 1974) ("It is clear to us that Patou has never put its product on the market in any meaningful way . . . ."); *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 365, 372 (S.D.N.Y. 2007) (holding that the mark holder did not use its mark in the ordinary course of trade because its initial activities were "never intended to generate revenue" but were instead intended to "generate a market for services that had not yet been developed but would be offered in the future"); *cf. Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 359 (6th Cir. 1998) (holding that the use of a mark in connection with employment recruiting activities was a use in commerce, even though it did not result in income, because it was understood that payment would occur if an employee was hired).

To the extent Scorpiniti argues that he was using THE GATE in connection with the development of his *The Gate* television program at the time of his application, the court notes that advertising of services alone or token use to reserve rights in a mark for later use are not sufficient to satisfy the use requirement. *See Gay Toys, Inc.*, 585 F.2d at 1068-69 (holding that a trademark application was void because the applicant's goods were not in existence at the time the application was filed and, therefore, the applicant had not used the mark in commerce in association with the goods); *see also Aycock Eng'g, Inc.*, 560 F.3d at 1360 ("The language of the statute . . . makes plain that advertisement and actual use of the mark in commerce are required; mere preparations to use that mark

13

sometime in the future will not do."); *La Societe Anonyme des Parfums le Galion*, 495 F.2d at 1273-74 (holding that publishing a newsletter was a token use "carried out for the sole purpose of laying a basis for securing the trademark registration" and not a bona fide use (quoting *Acad. of Motion Picture Arts & Scis. v. Acad. Awards, Inc.*, 89 U.S.P.Q. 451, 460-61 (Pat. Office Examiner-in-Chief 1951) (internal quotation mark omitted)); *Flavor Corp. of Am.*, 493 F.2d at 284 (finding that advertising and mailing price lists alone are not sufficient to acquire trademark rights).

Second, the court finds that Scorpiniti was not using THE GATE in connection with services rendered in more than one state. Scorpiniti testified that *Soul Search* was broadcast in central Iowa. Def. App'x at 3. Additionally, at the beginning of *Soul Search*, Hutchinson identifies the broadcast as occurring in central Iowa in the Des Moines metro area. *Id.* at 86. Although Scorpiniti testified that he had heard that "on occasion the [broadcast] footprint is considerably larger" than central Iowa, *id.* at 3, he has not produced any documentation to substantiate the claim that *Soul Search* aired outside of central Iowa. *See Frevert v. Ford Motor Co.*, 614 F.3d 466, 473-74 (8th Cir. 2010) ("[T]he plaintiff must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." (quoting *Bacon v. Hennepin Cnty. Med. Ctr.*, 550 F.3d 711, 716 (8th Cir. 2008)) (internal quotation mark omitted)). While "purely intrastate uses may come under the provisions of the [Lanham] Act if they have a substantial economic effect on interstate, territorial or foreign commerce," *Iowa Farmers Union v. Farmers' Educ. & Co-op. Union*, 247 F.2d 809, 816 (8th Cir. 1957), the court cannot conclude from the record that *Soul Search*, as a local public access television show, has a substantial economic effect on interstate commerce. Scorpiniti has not produced any evidence that interstate travelers viewed *Soul Search* or that *Soul Search* had any other effect on interstate commerce. Although the videos that Scorpiniti provided to Hutchinson originated outside of the State of Iowa, the court cannot conclude that use of those videos

free of charge on a public access television channel has a substantial effect on interstate commerce.  Thus, the court finds that, at the time Scorpiniti applied to register his mark, he was not using the mark in interstate commerce.

In light of the above discussion, the court finds that there is no genuine issue of material fact on this issue.  At the time Scorpiniti applied to register THE GATE, he was not using the mark in commerce as required by 15 U.S.C. § 1051.

### b.    Use in connection with television broadcasting services

FTVS argues that, at the time he applied to register THE GATE, Scorpiniti was not using THE GATE in connection with television broadcasting services because THE GATE only appeared as part of a public access television program and Scorpiniti was not involved in broadcasting the program.  In response, Scorpiniti argues that he used THE GATE in connection with television broadcasting services because he secured the rights to broadcast music videos and provided those videos to Hutchinson to show on *Soul Search*.

Scorpiniti's mark was registered under International Class 38, which covers telecommunications services.  *See* 37 C.F.R. § 6.1.  The Explanatory Note for International Class 38 states the following:

> Class 38 includes mainly services allowing at least one person to communicate with another by a sensory means.  Such services include those which:
> (1) allow one person to talk to another,
> (2) transmit messages from one person to another, and
> (3) place a person in oral or visual communication with another (radio and television).
> This class includes, in particular:
> —services which consist essentially of the diffusion of radio or television programmes.

Defendant's Supplemental Appendix ("Def. Supp. App'x") (docket no. 69-1) at 185 (emphasis omitted).  Services relating to "[e]ducation; providing of training; entertainment; sporting and cultural activities" fall under International Class 41.  37 C.F.R. § 6.1.

15

The Trademark Trial and Appeal Board ("TTAB") has discussed the difference between providing radio entertainment services and radio broadcasting services, stating that services in Class 38 pertain to the means of communication and not the communication itself. *In re Tichenor Media Sys., Inc.*, 2000 TTAB LEXIS 314, at *11 (T.T.A.B. May 12, 2000). TTAB went on to state that, as noted in the Explanatory Note for Class 38, Class 38 services involve the "diffusion or transmission of content," while the "production of content" falls within Class 41. *Id.* at *12 (quoting J. Marshall, Guide to the Nice Agreement Concerning the International Classification of Goods and Services 185-86 (2000)); *see also In re Broad. Architecture, Inc.*, 2009 TTAB LEXIS 97, at *6-7 (T.T.A.B. Mar. 19, 2009) (finding that a mark associated with a program that was broadcast over radio was not used in connection with radio broadcasting services for the purposes of Class 38 because "Class 38 services involve the means or medium of broadcasting, not the subject matter of the broadcast" and the mark in question was "used on the specimens to identify the subject matter of the broadcast"). Additionally, regarding telecommunications, the Code of Federal Regulations defines a "Broadcasting Service" as "[a] radiocommunication service in which the transmissions are intended for direct reception by the general public. This service may include sound transmissions, television transmissions or other types of transmission." 47 C.F.R. § 2.1.

The court finds that, at the time he applied to register THE GATE, Scorpiniti did not use his mark in connection with television broadcasting services. First, Scorpiniti was not involved in the advertising, production or transmission of *Soul Search*. As he stated in his deposition, the only involvement Scorpiniti had with *Soul Search* was to provide free music videos to Hutchinson for use on the program. Def. App'x at 5. Additionally, although THE GATE appeared on the *Soul Search* program, there is no evidence that Scorpiniti was involved in the transmission of *Soul Search* or any other aspect of broadcasting the show. Therefore, a reasonable jury could not find that Scorpiniti was

using THE GATE in connection with television broadcasting services as contemplated under the Class 38 classification.

Scorpiniti cites another TTAB decision, *Corinthian Broadcasting Corp. v. Nippon Electric Co.*, 1983 TTAB LEXIS 145 (T.T.A.B. Jan. 7, 1983), in support of his argument that providing music videos to *Soul Search* constituted television broadcasting services. *Corinthian Broadcasting Corp.* is distinguishable from the instant action, however, because the party providing television broadcasting services in that case encouraged television stations to carry television programs, rented facilities to produce programs and leased telephone lines to distribute the programs. *Id.* at *3-4. Scorpiniti did not similarly participate in activities relating to the broadcast of *Soul Search*.

Thus, the court finds that there is no genuine issue of material fact on this issue. At the time he applied to register THE GATE, Scorpiniti did not use THE GATE in connection with television broadcasting services. *See Aycock Eng'g*, 560 F.3d at 1361 (finding that the use requirement was not met because "the service described in [the plaintiff's] service mark application covers only the arranging of flights between an air taxi operator and a passenger, and not preparatory efforts to arrange a network of air taxi operators"); *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 48 (2d Cir. 1978) ("[E]ven if a mark is registered, the presumption of an exclusive right to use it extends only so far as the goods or services noted in the registration certificate . . . .").

###### c.   *Summary*

In light of the above discussion, the court shall grant summary judgment on Counterclaim I, and the court shall cancel Scorpiniti's THE GATE service mark. Because Scorpiniti did not have a valid trademark at the time FTVS's *The Gates* aired, Scorpiniti's infringement claim fails as a matter of law. Thus the court shall also grant the Motion with respect to Count I of the Complaint.

###### 2.   *Likelihood of confusion*

17

FTVS argues that, even if Scorpiniti had a validly registered service mark at the time FTVS's *The Gates* aired, Scorpiniti's infringement claim fails because there is no likelihood of confusion.  In response, Scorpiniti argues that there is a genuine issue of material fact as to whether there is a likelihood of confusion between the two marks.

In his infringement claim, Scorpiniti alleges reverse confusion,[4] which "occurs when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 474 (3d Cir. 1994).

> In reverse confusion, the junior user saturates the market with a similar trademark and overwhelms the senior user.  The public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter.  The result is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

*Id.* at 474-75 (quoting *Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987)).

To succeed on his infringement claim, Scorpiniti must demonstrate that FTVS's use of THE GATES "creates a likelihood of confusion, deception, or mistake on the part of an appreciable number of ordinary purchasers as to an association between" the two television programs.  *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626 (8th Cir. 1987). Regardless of whether the confusion alleged is forward or reverse, the plaintiff must establish likelihood of confusion.  *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 492 n.4 (1st Cir. 1981).

---

[4] The Eighth Circuit Court of Appeals has not explicitly recognized the doctrine of reverse confusion.

To determine whether there is a likelihood of confusion, the court considers the following factors:

> 1) the strength of the plaintiff's mark; 2) the similarity between the plaintiff's mark and the alleged infringing mark; 3) the degree to which the allegedly infringing product competes with the plaintiff's goods; 4) the alleged infringer's intent to confuse the public; 5) the degree of care reasonably expected of potential customers; and 6) evidence of actual confusion.

*Ga.-Pac. Consumer Prods. LP v. Myers Supply, Inc.*, 621 F.3d 771, 775 (8th Cir. 2010) (citing *Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2005)); *see also Duluth News-Tribune, a Div. of Nw. Publ'ns, Inc. v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1096 (8th Cir. 1996) (citing *Anheuser-Busch, Inc. v. Balducci Publ'ns*, 28 F.3d 769, 774 (8th Cir. 1994)) (same); *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980) (establishing factors). "These factors do not operate in a mathematically precise formula; rather, [the court uses] them at the summary judgment stage as a guide to determine whether a reasonable jury could find a likelihood of confusion." *Duluth News-Tribune*, 84 F.3d at 1096. "[N]o one factor controls, and because the inquiry is inherently case-specific, different factors may be entitled to more weight in different cases." *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1054 (8th Cir. 2005). "Factual disputes regarding a single factor are insufficient to support the reversal of summary judgment unless they tilt the entire balance in favor of such a finding." *Duluth News-Tribune*, 84 F.3d at 1096. "When . . . a trademark dispute centers on the proper interpretation to be given to the facts, rather than on the facts themselves, summary disposition is appropriate." *Id.* at 1099; *accord Woodsmith Publ'g Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir. 1990). The court shall address each of the likelihood of confusion factors in turn.

### a.   *Strength of Scorpiniti's mark*

FTVS argues that Scorpiniti's mark is not entitled to protection because it is

descriptive and has not acquired a secondary meaning.  FTVS further argues that, even if Scorpiniti's mark is suggestive and, therefore, entitled to protection, the likelihood of confusion is low because Scorpiniti's suggestive mark would still be weak.  In response, Scorpiniti argues that, in a reverse confusion case, the strength of FTVS's mark is the relevant factor because a strong junior user's mark is more likely to overpower a smaller senior user's mark.  Scorpiniti further argues that, because FTVS's mark is strong and Scorpiniti's mark is weak, there is a greater likelihood of reverse confusion.

In evaluating the strength of a mark, the court examines the mark's conceptual strength or inherent distinctiveness and its commercial strength in the marketplace. *George & Co. v. Imagination Entm't Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009); *see also* 2 McCarthy, *supra*, § 11:83 ("While some courts have made the strong-weak evaluation solely upon the place of a term on the spectrum of marks, such an approach is incomplete. One must in addition look at the marketplace strength of the mark at the time of litigation or at the time registration is sought." (footnote omitted)).

### I.      *Conceptual strength*

FTVS argues that Scorpiniti's mark is descriptive because Scorpiniti disclaimed exclusive rights to "the, gate" in his registration application.  FTVS further argues that Scorpiniti has not shown that THE GATE has acquired a secondary meaning and, therefore, THE GATE is not entitled to protection.  Alternatively, FTVS argues that, even if Scorpiniti's mark is suggestive, the suggestive mark is still conceptually weak.  In response, Scorpiniti argues that both THE GATE and THE GATES are suggestive because they "require an exercise in mental gymnastics to arrive at a meaning that the content of shows is related to the services."  Resistance at 11-12.

In evaluating a mark's conceptual strength, the court classifies the mark in

> one of four categories: 1) arbitrary or fanciful, 2) suggestive,
> 3) descriptive, or 4) generic.  An arbitrary or fanciful
> trademark is the strongest type of mark and is afforded the

20

> highest level of protection.  At the other end of the spectrum,
> a generic term is one that is used by the general public to
> identify a category of goods, and as such merits no trademark
> protection.  Suggestive and descriptive marks fall somewhere
> in between.  A suggestive mark is one that requires some
> measure of imagination to reach a conclusion regarding the
> nature of the product.  A descriptive mark, on the other hand,
> immediately conveys the nature or function of the product and
> is entitled to protection only if it has become distinctive by
> acquiring a secondary meaning.

*Duluth News-Tribune*, 84 F.3d at 1096 (internal citations omitted).

A descriptive mark "is protectible only if shown to have acquired a secondary meaning." *Frosty Treats, Inc. v. Sony Computer Entm't Am., Inc.*, 426 F.3d 1001, 1005 (8th Cir. 2005).  "'Secondary meaning is an association formed in the minds of consumers between the mark and the source or origin of the product.'" *Id.* (quoting *Co-Rect Prods., Inc. v. Marvy! Adver. Photography, Inc.*, 780 F.2d 1324, 1330 (8th Cir. 1985)).

> To establish secondary meaning, the user must show that the
> mark or symbol by long and exclusive use and advertising
> * * * in the sale of [the user's] goods * * * [has] become so
> associated in the public mind with such goods * * * that it
> serves to identify them and distinguish them from the goods
> * * * of others."

*Co-Rect Prods.*, 780 F.2d at 1330 (alterations in original) (quoting *Truck Equip. Serv. Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1219 (8th Cir. 1976)) (internal quotation marks omitted).

"When it comes to conceptual strength . . . just as in direct confusion cases, a strong mark should weigh in favor of a senior user." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 231 (3d Cir. 2000); *see also Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 472 (3d Cir. 2005) ("The inquiry into distinctiveness or conceptual strength is the same whether plaintiff is alleging direct or reverse confusion."). "Stronger marks receive greater protection." *Freedom Card, Inc.*,

432 F.3d at 472.

Scorpiniti acknowledges that his mark is weak, stating that the USPTO required him to disclaim THE GATE as inherently distinctive.  Plaintiff's Statement of Additional Material Facts (docket no. 66-2) ¶ 39.  Under the Lanham Act, "[t]he Director may require the applicant to disclaim an unregistrable component of a mark otherwise registrable.  An applicant may voluntarily disclaim a component of a mark sought to be registered."  15 U.S.C. § 1056(a); *see also* 2 McCarthy, *supra*, § 11:52 ("Under § 6 of the federal Lanham Act, the Commissioner has the power to require an applicant to disclaim rights in descriptive portions of a composite mark.").  The Court of Customs and Patent Appeals has indicated that a disclaimer in a trademark application renders the mark descriptive.  *See Quaker State Oil Refining Corp. v. Quaker Oil Corp.*, 453 F.2d 1296, 1299 (C.C.P.A. 1972) ("[W]hen [appellant] disclaimed [the term SUPER BLEND] in applications for registrations of compound marks, it . . . admitted the merely descriptive nature of the mark and acknowledged that it did not have an exclusive right therein at that time."); *Andrew J. McPartland, Inc. v. Montgomery Ward & Co.*, 164 F.2d 603, 605 (C.C.P.A. 1947) ("[I]t appears from the record that in appellant's registration it was stated that 'No claim is made to the individual syllables of the mark, each apart from the other.' That statement amounts to saying that the mark as a whole is merely descriptive of the goods upon which it was used.").  Because Scorpiniti disclaimed "the, gate" in his registration application, the court finds that Scorpiniti's mark is descriptive.  Therefore, the mark is not entitled to protection unless Scorpiniti can demonstrate that THE GATE has acquired a secondary meaning.  *See Frosty Treats, Inc.*, 426 F.3d at 1005.

The court finds that there is no evidence that THE GATE acquired a secondary meaning.  Scorpiniti has not used THE GATE except in association with the program *Soul Search* on central Iowa Mediacom, a pilot episode of *The Gate* on YouTube and an episode of *The Gate* posted on Scorpiniti's personal Facebook page.  As of April 18, 2011, the

pilot episode of *The Gate* had been viewed fewer than 5,000 times on YouTube. Additionally, Scorpiniti never advertised *The Gate* on television, in newspapers or on the internet. There is no other evidence that consumers associate THE GATE with Scorpiniti, his *The Gate* television program or *Soul Search*. Thus, the court finds that THE GATE is a descriptive mark with no secondary meaning and is therefore not entitled to protection. *See Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1040-41 (2d Cir. 1992) (affirming summary judgment where descriptive mark lacked secondary meaning).

Additionally, the court finds that, even if THE GATE were suggestive, the mark is still conceptually weak. *See Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999) ("[U]nlike arbitrary or fanciful marks which are typically strong, suggestive marks are presumptively weak."); *Gilbert/Robinson, Inc. v. Carrie Beverage-Mo., Inc.*, 758 F. Supp. 512, 522 (E.D. Mo. 1991) (noting that a suggestive mark is a "comparatively weak mark"), *aff'd on other grounds*, 989 F.2d 985 (8th Cir. 1993); *Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1456 (S.D. Ohio 1990) (finding that, in a reverse confusion case, the strength of the mark factor did not weigh in favor of a finding of a likelihood of confusion in part because the plaintiff's mark was not fanciful or arbitrary and, therefore, not a strong mark). This finding is bolstered by the fact that Scorpiniti, while arguing that his mark is suggestive, also admits that his mark is weak. Resistance at 11. Thus, the court finds that Scorpiniti's mark is conceptually weak.

### ii. *Commercial strength*

FTVS argues that Scorpiniti's mark is commercially weak because Scorpiniti has not advertised his *The Gate* program, *The Gate* has not been widely distributed or viewed and there is no evidence that the public associates the mark THE GATE with Scorpiniti. In response, Scorpiniti argues that, because FTVS's THE GATES mark is commercially strong, the court should find that reverse confusion occurred.

23

"In examining a mark's commercial strength, [the court] examine[s] marketplace recognition." *Freedom Card, Inc.*, 432 F.3d at 472; *see also ConAgra, Inc. v. George A. Hormel, & Co.*, 990 F.2d 368, 369 (8th Cir. 1993) (noting that analysis of the strength of mark factor includes "marketplace recognition value"). "[E]vidence of third party usage of similar marks on similar goods is admissible and relevant to show that the mark is relatively weak and entitled to a narrower scope of protection." *Gen. Mills*, 824 F.2d at 626-27; *see also In re Broadway Chicken Inc.*, 38 U.S.P.Q.2d 1559, at 1565-66 (T.T.A.B. 1996) ("Evidence of widespread third-party use, in a particular field, of marks containing a certain shared term is competent to suggest that purchasers have been conditioned to look to the other elements of the marks as a means of distinguishing the source of goods or services in the field.").

> [I]n a reverse confusion claim, a court should analyze the "commercial strength" factor in terms of (1) the commercial strength of the junior user as compared to the senior user; and (2) any advertising or marketing campaign by the junior user that has resulted in a saturation in the public awareness of the junior user's mark.

*A & H Sportswear, Inc.*, 237 F.3d at 231. "'[T]he lack of commercial strength of the smaller senior user's mark is to be given less weight in the analysis because it is the strength of the larger, junior user's mark which results in reverse confusion.'" *Id.* (alteration in original) (quoting *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 444 (3d Cir. 2000)); *see also Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 303 (3d Cir. 2001) ("While analysis of the strength of the senior user's mark is relevant, the more important inquiry focuses on the junior user's mark."). "The question in such cases is whether consumers doing business with the senior user might mistakenly believe that they are dealing with the junior user." *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir. 1998).

The court finds that Scorpiniti's mark is commercially weak. As discussed above,

24

Scorpiniti has not used his mark except in association with the program *Soul Search* on central Iowa Mediacom, a pilot episode of *The Gate* on YouTube and an episode of *The Gate* posted on Scorpiniti's personal Facebook page.  Scorpiniti has not produced any evidence that he advertised his *The Gate* television show or any other programs featuring THE GATE, that the public associates THE GATE with his television show or that there has been any media coverage that would result in public association of THE GATE with Scorpiniti's programs.

Conversely, the court finds that FTVS's mark is commercially strong.  FTVS's *The Gates* program aired thirteen times on network television and was promoted through national advertisements.  However, the court notes that ABC canceled *The Gates* after its initial season.  Additionally, many television shows, motion pictures and other artistic works include the phrase "the gate" or "the gates."  *See Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1091 (C.D. Cal. 2003) (finding that, in a reverse confusion case, the strength of the mark factor did not weigh in favor of a finding of a likelihood of confusion because consumers are not likely to be confused between two marks when there is a "crowded field" of similar marks).  Thus, the court finds that, while FTVS's mark is commercially strong, Scorpiniti's mark is commercially weak and third parties also use the terms "the gate" or "the gates" for similar services in the marketplace.

### iii.    Summary

The court finds that, even though FTVS's mark is commercially strong, the strength of the mark factor does not weigh in favor of a finding of a likelihood of confusion. Whether descriptive or suggestive, Scorpiniti's mark is conceptually weak.  Scorpiniti's mark is also commercially weak.  Additionally, the phrases "the gate" and "the gates" have been used in numerous titles of television shows and other artistic works.  Therefore, the court finds that consumers are not likely to associate Scorpiniti's *The Gate* television

show with FTVS's *The Gates* program given the weakness of Scorpiniti's mark and the number of other television programs and artistic works that use the phrase "the gate" or "the gates." *See Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 992 (C.D. Cal. 2002) ("[W]hile defendants' commercial strength is likely to overwhelm plaintiff in the marketplace to the extent their products compete, the court concludes that [the plaintiff] will not likely be able to prove that the strength of the mark factor favors a finding of likelihood of confusion because its own mark is conceptually weak and operates in a crowded field."). Thus, the strength of the mark factor weighs against a finding of a likelihood of confusion.

### b.    Similarity

FTVS argues that THE GATE and THE GATES are not highly similar because "the fonts are distinct and descriptive of different things and each mark bears an additional house brand or source identifier." Defendant's Memorandum in Support of Motion ("Def. Brief") (docket no. 55-1) at 18. Scorpiniti argues that the marks are confusingly similar because the wording of the marks is nearly identical.

In considering the similarity between the parties' marks, the court "must look to the overall impression created by the marks, not merely compare individual features." *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 830 (8th Cir. 1999). The court "may consider the marks' visual, aural, and definitional attributes and compare the trade dress of products in determining whether the total effect conveyed by the two marks is confusingly similar." *Id.* "The use of identical dominant words does not automatically mean that two marks are similar. . . ." *Id.*

The court finds that THE GATE and THE GATES are not confusingly similar. Although the marks both use the phrase "the gate," the font colors and typefaces are distinct. In his deposition, Scorpiniti discussed at length the difference in the font colors of the two marks, stating that THE GATE is "not red, no. It's not. It's not red at all.

26

No. I'm sorry. Just the thought of it threw me. Bloody gates, no, no. . . ." Def. App'x at 33.

Furthermore, in the pilot for Scorpiniti's *The Gate*, the mark THE GATE is accompanied by the phrase "positive impact music," while FTVS's THE GATES is accompanied by the ABC logo. The court finds that the accompanying source identifier and house mark reduce the likelihood of confusion due to similarity between the marks. *See CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 271 (4th Cir. 2006) ("If one of two similar marks is commonly paired with other material, that pairing will service to lessen any confusion that might otherwise be caused by the textual similarity between the two marks."); *Luigino's*, 170 F.3d at 831 ("The use of different colors and typefaces, as well as the prominent display of the house marks convey perceptible distinctions between the products."); *Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1566-68 (Fed. Cir. 1994) (finding no likelihood of confusion in part due to a prominent logo displayed on the defendant's product); *Gen. Mills*, 824 F.2d at 627 (finding that sufficiently prominent house marks make it likely that consumers will distinguish between products).

Scorpiniti cites to dicta in *A & H Sportswear, Inc.*, 237 F.3d at 230, in support of his argument that, in a reverse confusion case, the presence of a house mark "will aggravate rather than mitigate the likelihood of confusion." Resistance at 13. However, the court finds that the presence of a source identifier and a house mark in association with the marks in this case mitigates the likelihood of confusion. *See A & H Sportswear, Inc.*, 237 F.3d at 230 (noting that house marks mitigate likelihood of confusion when a house mark appears consistently with the trademark and both trademarks are accompanied by house marks). Thus, the similarity factor does not weigh in favor of a finding of likelihood of confusion.

   *c.*  ***Competitive proximity***

FTVS argues that there is no competition between the services Scorpiniti and FTVS offer because, although both programs relate to television, the programs are vastly different. In response, Scorpiniti argues that there is competition because both marks are associated with television shows and differences between the productions are not relevant in the context of initial interest confusion.

"If . . . two companies' products are closely related, confusion among customers is more likely." *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 766 (8th Cir. 2010); *see also Davis*, 430 F.3d at 904 ("If the products are closely related, and it is reasonable for consumers to believe the products come from the same source, confusion is more likely."). "If products are 'wholly unrelated' this factor weighs against a finding that confusion is likely." *Davis*, 430 F.3d at 904 (quoting *Kemp*, 398 F.3d at 1056).

After reviewing the record and viewing specimens of both *The Gate* and *The Gates*, the court agrees with FTVS that the two programs are vastly different. *The Gates* is a network-quality hour-long drama series that features supernatural beings residing together in a gated community. Additionally, *The Gates* has a high production value, with one episode costing over two million dollars to make. *The Gate*, on the other hand, is a half-hour program that features religion-themed music videos and one or two hosts acting as video jockeys. The production value of *The Gate* is low compared with *The Gates*, and Scorpiniti stated that he had invested only $121,000 to produce a pilot and thirteen episodes. Pl. App'x at 5. Additionally, the content of the two shows—science fiction and religion-themed music videos—is dissimilar. Dane Shearer and Debra Shearer testified that *The Gate* and *The Gates* had substantially different content, describing the programs as "almost the opposite," Def. App'x at 64, and "opposite," *id.* at 72. Scorpiniti testified that he thought the content of the shows was so different that he did not think that they could "coexist." *Id.* at 20. Thus, the court finds that there is little to no competition

between the programs.  *See Davis*, 430 F.3d at 904 (concluding that there was no competitive proximity because "a movie designed for children's entertainment that airs on a national children's network is not so similar to an infrequently broadcast cable-access environmental advocacy television program that consumers are likely to believe the two products came from the same source"); *Warner Bros. Inc. v. ABC, Inc.*, 720 F.2d 231, 246 (2d Cir. 1983) (concluding there was no likelihood of confusion due to differences in the "total concept and feel" of a television program and a superhero franchise that includes television programs); *Motown Prods., Inc. v. Cacomm, Inc.*, 668 F. Supp. 285, 290 (S.D.N.Y. 1987) ("Even a brief look at the two programs establishes beyond doubt that no 'purchaser,' whether it be a programming executive, potential advertiser, or ordinary television viewer, could confuse the sources of the two versions.  The Motown Program is a slick, network-quality production resembling such well-known programs as 'The Tonight Show' . . . and 'Late Night' with David Letterman.  The Cacomm Program, by contrast, is an amateurish, one-camera, interviews-only production." (citation omitted)), *rev'd on other grounds*, 849 F.2d 781 (2d Cir. 1988).

With respect to Scorpiniti's argument regarding initial interest confusion, the court finds it unnecessary to address Scorpiniti's argument because the parties' services are not similar.  *See Hasbro, Inc. v. Clue Computing, Inc.*, 232 F.3d 1, 2 (1st Cir. 2000) (per curiam) (affirming the district court's "refusal to enter the 'initial interest confusion' thicket . . . given the unlikelihood of 'legally significant' confusion"); *see also Savin Corp. v. Savin Grp.*, 391 F.3d 439, 462 n.13 (2d Cir. 2004) ("Internet initial interest confusion requires a showing of intentional deception.").  Thus, the court finds that the competitive proximity factor weighs against a finding of a likelihood of confusion.

> ### d.    *Intent*

FTVS argues that there is no evidence that it intended to infringe on Scorpiniti's mark because, although it was aware of Scorpiniti's mark, it believed in good faith that it

was not infringing on THE GATE.  In response, Scorpiniti argues that FTVS was careless in its decision to use THE GATES.

Scorpiniti is not required to prove that FTVS intended to confuse or deceive consumers.  *See Davis*, 430 F.3d at 904; *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1045 (D.C. Cir. 1989).  However, an intent to deceive "retains potency" and "when present, it is probative evidence of a likelihood of confusion." *Blinded Veterans Ass'n*, 872 F.2d at 1045.  "[A] defendant's intent to confuse in a reverse confusion case can . . . be relevant to the likelihood of confusion." *Freedom Card, Inc.*, 432 F.3d at 473.  "The offender in a reverse confusion case will typically exploit confusion to push the senior user out of the market." *Id.*

The court finds that there is no evidence that FTVS intended to confuse or deceive consumers or push Scorpiniti out of the market.  FTVS conducted a pre-filing trademark search for "The Gates," responded to the USPTO's concerns regarding the likelihood of confusion and went forward using THE GATES after the USPTO found no likelihood of confusion with Scorpiniti's mark.  Although FTVS was aware of Scorpiniti's mark, there is no evidence in the record to support a finding of intent.  *See Gen. Mills*, 824 F.2d at 627 ("Knowledge of another's product . . . is not . . . equivalent to an intent by a new entrant to a market to mislead and to cause consumer confusion.").

To the extent that Scorpiniti argues FTVS was careless in choosing the mark THE GATES, the court finds that such argument is not persuasive.  Scorpiniti cites *Altira Group LLC v. Philip Morris Cos.*, 207 F. Supp. 2d 1193, 1200 (D. Colo. 2002), for the proposition that "the appropriate intent inquiry is whether defendant acted carelessly or otherwise culpably in selecting the allegedly infringing name." *Id.*  However, the court finds that FTVS's pre-filing search and work with the USPTO to ensure that there would be no likelihood of confusion with Scorpiniti's mark do not support a finding of carelessness.  *See id.* at 1200-01 (finding no indication of carelessness, indifference or

otherwise culpable conduct where the defendant conducted a thorough search after selecting its name and its counsel made a good faith effort to determine whether its mark would conflict with the plaintiff's mark). Thus, the court finds that the intent factor does not weigh in favor a finding of a likelihood of confusion.

### e.    Degree of care

FTVS argues that "television consumers are likely to exercise at least a moderate amount of care when deciding on what television show to watch since they are expending their free time on this form of entertainment." Def. Brief at 25. In response, Scorpiniti argues that consumers will exercise a low amount of care in choosing programs to watch because television is free.

In assessing the degree of care consumers are likely to exercise, the court "must stand in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Luigino's*, 170 F.3d at 831 (quoting *Gen. Mills*, 824 F.3d at 627) (internal quotation marks omitted). "When products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care." *Recot, Inc. v. Becton*, 214 F.3d 1322, 1329 (Fed. Cir. 2000).

The court notes that there is no evidence regarding the degree of care television viewers are likely to exercise in choosing programs to watch. Thus, the court finds that this factor is neutral, and does not weigh in favor of a finding of a likelihood of confusion. *Cf. Lemme v. Nat'l Broad. Co., Inc.*, 472 F. Supp. 2d 433, 451 (E.D.N.Y. 2007) (finding that the sophistication of the viewers did not weigh in favor of a finding of a likelihood of confusion because there was no evidence regarding the sophistication of television program viewers); *Chi. Tribune Co. v. Fox News Network, LLC*, 520 F. Supp. 2d 930, 937 (N.D. Ill. 2007) (finding that the degree of care factor did not weigh in favor of

likelihood of confusion because there was no evidence regarding the degree of care television viewers would exercise in choosing television programs).

### f.   Actual confusion

FTVS argues that Scorpiniti has not shown instances of actual confusion because his evidence is inadmissible hearsay and reveals only an inattentiveness on the part of the consumer, not actual confusion.   In response, Scorpiniti argues that he has produced evidence of actual confusion because the number of views of the pilot episode of *The Gate* on YouTube substantially increased at the same time ABC began advertising and airing *The Gates*.

"'[W]hen determining whether there exists a likelihood of confusion, weight is given to the number and extent of instances of actual confusion.'"   *Duluth News-Tribune*, 84 F.3d at 1098 (alteration in original) (quoting *Life Techs., Inc. v. Gibbco Scientific, Inc.*, 826 F.2d 775, 777 (8th Cir. 1987)).   "[C]onfusion that is brief or that occurs among individuals who are not familiar with the products in question is entitled to considerably less weight than are 'chronic mistakes and serious confusion of actual customers.'"   *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 634 (6th Cir. 2002) (quoting *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1110 (6th Cir. 1991)).   "In evaluating the evidence at the summary judgment stage, [the court] consider[s] only those responses that are supported by admissible evidence."   *Duluth News-Tribune*, 84 F.3d at 1098.

Scorpiniti points to the following instances in support of his argument that actual confusion occurred: (1) a comment by Scorpiniti's former girlfriend saying "there you are" upon seeing an advertisement for *The Gates*, Def. App'x at 26; (2) an unidentified man at a bar who asked Scorpiniti if he was the producer of *The Gates*; (3) a YouTube report showing that views of Scorpiniti's *The Gate* pilot increased during the summer of 2010 when ABC was advertising *The Gates*; and (4) a Google search of the term "abc the gate"

and corresponding results in which FTVS's television show was misspelled as "The Gate," Def. App'x at 75.

The court finds that none of these purported instances of actual confusion suggest a likelihood of confusion. First, the statements by Scorpiniti's former girlfriend and the unidentified man at the bar are hearsay and Scorpiniti has not identified an applicable hearsay exception. *See* Fed. R. Evid. 801, 802; *see also Duluth News-Tribune*, 84 F.3d at 1098 (refusing to consider hearsay evidence and stating that the evidence is "of a particularly unreliable nature given the lack of an opportunity for cross-examination . . . regarding the reason for the 'confusion'"). Notably, Scorpiniti makes no mention of these alleged instances of confusion in his Resistance. *See* Resistance at 17.

Additionally, the court notes that minimal and isolated instances of confusion are considered de minimis evidence insufficient to create genuine issues of material fact. *See Savin Corp.*, 391 F.3d at 459 (holding that a single incident of actual confusion at a meeting was de minimis and insufficient to support a finding of a likelihood of confusion); *Duluth News-Tribune*, 84 F.3d at 1098 (holding that evidence of misdirected mail and phone calls, even if admissible, was de minimis). Thus, even if the evidence of confusion from Scorpiniti's former girlfriend and the unidentified man at the bar were admissible, it is not sufficient to support a finding of likelihood of confusion.

Second, the court finds that the increase of views of the pilot episode of *The Gate* on YouTube and the Google search do not support a finding of actual confusion. As FTVS points out, the Google search itself identified ABC as the source of *The Gates*. *See* Def. App'x at 75. Thus, anyone searching for "abc the gate" would not be confused about the source of the program sought when both the search and the results include the term ABC.

Additionally, regarding both the Google search and the YouTube views, the court finds that errors in spelling or views of a pilot erroneously found through an internet search engine illustrate inattentiveness or carelessness on the part of the searcher and do

33

not support an inference of actual confusion.  *See Therma-Scan, Inc.*, 295 F.3d at 634 ("[T]he fact that the confusion occurred in e-mail messages raises the possibility that consumers sent the inquiries . . . to [the plaintiff] rather than [the defendant] because they were inattentive or careless, as opposed to being actually confused."); *Duluth News-Tribune*, 84 F.3d at 1098 (finding that evidence of misdirected mail and phone calls "show[s] inattentiveness on the part of the caller or sender rather than actual confusion"). The court further notes that, based on the differences in appearance, content and production value discussed above, any viewer that mistakenly viewed the pilot episode of *The Gate* while searching for *The Gates* would quickly realize that the two programs come from different sources.  *See Hasbro, Inc.*, 232 F.3d at 2, 3 (affirming the district court's finding of no likelihood of confusion where "all that Hasbro showed was that over a period of years a couple of Internet surfers looking for Hasbro's Clue® site had stumbled upon the Clue Computing site, whose content strongly indicated that the site had little to do with Hasbro's business").  Thus, the court finds that Scorpiniti has not shown any instances of actual confusion that would support a finding of a likelihood of confusion.

> ### g.   *Summary*

In light of the above discussion, the court finds that there is no genuine issue of material fact regarding whether there is a likelihood of confusion.  None of the factors weigh in favor of a likelihood of confusion.  Additionally, even if THE GATE is suggestive and the strength of the mark weighs somewhat in favor of a finding of a likelihood of confusion, the factor alone would not tip the balance in favor of a finding of a likelihood of confusion.  *See Duluth News-Tribune*, 84 F.3d at 1096 ("Factual disputes regarding a single factor are insufficient to support the reversal of summary judgment unless they tilt the entire balance in favor of such a finding.").  Therefore, the court finds that a reasonable jury could not find a likelihood of confusion, and the court shall grant the Motion with respect to Count I of the Complaint on this alternative ground.

### 3.    First Amendment

FTVS argues that, even if THE GATE were protectible and there were a likelihood of confusion, FTVS's First Amendment interest in using an artistically relevant name as the title of its television show outweighs Scorpiniti's trademark interests in THE GATE. In response, Scorpiniti argues that FTVS's First Amendment rights do not outweigh his trademark interests.

Because the court has already found that THE GATE is not protectible and there is no likelihood of confusion, the court finds it unnecessary to address FTVS's First Amendment argument. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) ("[I]t is a well-established principle governing the prudent exercise of [the court's] jurisdiction that normally the [c]ourt will not decide a constitutional question if there is some other ground upon which to dispose of the case." (quoting *Escambia Cnty., Fla. v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam)) (internal quotation marks omitted)).

### 4.    Damages

FTVS argues that, even if Scorpiniti can bring a claim for infringement or unfair competition, Scorpiniti has failed to establish that he is entitled to damages.  The court finds that, because Scorpiniti's claims fail as a matter of law, it is not necessary to address the question of damages.

## B.  Remaining Claims

Count II of the Complaint alleges false designation of origin and unfair competition in violation of 15 U.S.C. § 1125, and Count III alleges unfair competition under Iowa law. The court finds that Scorpiniti's false designation of origin and unfair competition claim in Count II fails for the same reasons as discussed above.  *See* 15 U.S.C. § 1125 (requiring use in commerce and likelihood of confusion for a cause of action); *Sensient Techs. Corp.*, 613 F.3d at 763 n.3 ("[The plaintiff] must show a likelihood of confusion as part of its

Lanham Act claims, [including infringement and unfair competition]."). Scorpiniti's unfair competition claim under Iowa law also fails for the same reasons as discussed above. *See Basic Chems., Inc. v. Benson*, 251 N.W.2d 220, 231-32 (Iowa 1977) (stating that a plaintiff must show a likelihood of confusion to sustain a common law unfair competition claim). Thus, the court shall grant the Motion with respect to Counts II and III of the Complaint.

## VII. CONCLUSION

In light of the foregoing, **IT IS HEREBY ORDERED**:

(1)     FTVS's Motion for Summary Judgment (docket no. 55) is **GRANTED**;

(2)     Counts I, II and III of the Complaint (docket no. 15) are **DISMISSED**;

(3)     Scorpiniti's service mark THE GATE, U.S. Reg. 3,536,556, is **CANCELED**. Counterclaim II is **DISMISSED AS MOOT**.

(4)     The Clerk of Court is **DIRECTED** to terminate Plaintiff's Motion in Limine (docket no. 71) and Defendant's Motion in Limine (docket no. 72) as moot; and

(5)     The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant Fox Television Studios, Inc. and against Plaintiff Louis J. Scorpiniti, release the trial date and **CLOSE THIS CASE**.

**DATED** this 23rd day of January, 2013.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA